452 F.3d 174
 Elaine L. CHAO, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,
v.
Joseph MERINO, Sandra Briand, Defendants-Appellants,
Helen Williams, Donald Gancio, Clarke Lasky, and International Brotherhood of Industrial Workers Health and Welfare Fund, Defendants.
Docket No. 04-2125-cv.
 United States Court of Appeals, Second Circuit.
 Argued: October 18, 2005.
 Decided: June 21, 2006.
 
 Benjamin L. Apt, Trial Attorney, United States Department of Labor, Washington, D.C. (Howard M. Radzely, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, United States Department of Labor, Washington, D.C., on the brief), for Plaintiff-Appellee.
 Paula Schwartz Frome, Garden City, NY, (James O. Druker, Kase & Druker, Garden City, NY, on the brief), for Defendants-Appellants.
 Before KEARSE, MINER, and HALL, Circuit Judges.
 KEARSE, Circuit Judge.
 
 
 1
 Defendants Sandra Briand and Joseph Merino appeal from so much of a judgment of the United States District Court for the Eastern District of New York, entered after a bench trial before Arlene R. Lindsay, Magistrate Judge, as (1) found them liable for breach of fiduciary duties imposed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., (2) held Merino jointly and severally liable for $352,271 in losses to the International Brotherhood of Industrial Workers Health and Welfare Fund (the "Fund" or "BIW Fund"), (3) held Briand jointly and severally liable for $177,271 of that amount, and (4) permanently enjoined each of them from serving as a fiduciary or service provider to any employee benefit plan. On appeal, Briand contends that the district court erred in finding that she breached her fiduciary duty to the Fund, in finding that any breach by her caused the Fund injury, and in barring her from future positions as a fund fiduciary or service provider. Although the notice of appeal was filed on behalf of both Briand and Merino, no arguments have been presented on behalf of Merino, either in the brief filed in the name of both appellants or at oral argument. Accordingly, any challenge Merino may have had to the judgment has been waived, and as to Merino, the judgment is affirmed. With respect to Briand, we affirm for the reasons that follow.
 
 I. BACKGROUND
 
 2
 The BIW Fund was an ERISA-covered employee benefit plan established pursuant to a trust agreement among the International Brotherhood of Industrial Workers Locals 119 and 835 (collectively the "Union") and the employers of Union members. The purpose of the BIW Fund was to provide benefits to its participants with respect to, inter alia, accidents and health care. Between 1988 and August 1994 the Fund's Administrator was Merino.
 
 
 3
 During that period, Briand was Merino's wife. From 1981 to August 1994, Briand was employed by Local 119 in various capacities; from 1985 to August 1994, she served as its president. In August 1994, Briand became the Administrator of the Fund.
 
 
 4
 The present action, commenced in 1998 by the United States Secretary of Labor (the "Secretary"), charged that Merino and Briand breached their fiduciary duties, imposed on them by ERISA, by allowing the BIW Fund to deal with a known embezzler who proceeded to embezzle employer contributions meant for the Fund. The facts pertinent to this appeal, as found by the district court in a Memorandum and Decision dated August 21, 2003 ("District Court 2003 Opinion"), or as corrected in a Decision and Order dated February 6, 2004 ("District Court 2004 Order"), are largely undisputed and are summarized as follows.
 
 
 5
 A. The BIW Fund's Agreements With Clarke Lasky
 
 
 6
 Clarke Lasky ("Lasky") was the president and owner of Employee Health Plan Administrators ("EHPA"), a company that represented employers in their relations with employee benefit funds by, inter alia, enrolling the employers and their employees in the funds and collecting and transmitting employers' contributions to the funds. In 1984, Lasky was convicted of embezzling funds from an employee benefit plan. He was ordered to make restitution of the embezzled funds and was sentenced to six years' imprisonment.
 
 
 7
 In 1991, after his release from prison, Lasky approached Merino with a proposal to enroll approximately 1,000 employees of EHPA's employer clients in the BIW Fund. Those employees had previously been enrolled in a benefits plan administered by the National Organization of Industrial Trade Unions ("NOITU"). Merino was aware of Lasky's prior conviction for embezzling money from another employee benefit fund. Accordingly, Merino inquired of a NOITU official as to why the EHPA-NOITU relationship had been terminated. The NOITU official he consulted was Daniel Lasky, Lasky's uncle.
 
 
 8
 Daniel Lasky advised Merino not to do business with his nephew, saying that Lasky was "a bum," meaning that Lasky "didn't live up to his word." (Deposition of Joseph Merino at 50.) Daniel Lasky told Merino that NOITU had severed its relationship with Lasky and EHPA after Lasky failed to remit more than $100,000 in employer contributions to NOITU. See District Court 2003 Opinion at 4.
 
 
 9
 When Merino confronted Lasky with Daniel Lasky's statements, Lasky claimed that the problem with NOITU had arisen because a few of his employer clients had fallen behind on their contributions and that the contributions would eventually be paid. Exploring further, Merino examined EHPA's contracts with employers to verify that they had some 1,000 employees who could be enrolled in the BIW Fund; he visited EHPA's offices and was impressed by their appearance; and he "demanded that Lasky swear on his (Lasky's) mother that he would not do to [the] BIW [Fund] what he had done to NOITU." Id. (internal quotation marks omitted). Merino also demanded that Lasky be bonded in order to do business with the BIW Fund; and although "Lasky eventually produced what purported to be a bond, ... Merino later learned that a bond had never actually been purchased." Id.
 
 
 10
 Merino presented Lasky's proposal at a meeting of Fund trustees, which was attended by the Fund's attorneys. Lasky's prior conviction was discussed, and the Fund thereafter requested and received a letter from his probation officer stating that Lasky was not prohibited from working with employee benefit funds. Merino, testifying at his deposition, did not recall whether he disclosed to the trustees his conversation with Daniel Lasky.
 
 
 11
 Briand attended that trustees' meeting in her capacity as president of Local 119. She was not then a Fund trustee, and she had no vote. However, at an earlier meeting with Merino, Daniel Lasky, and the Fund's attorneys, Briand had stated her view that the Fund should refrain from doing business with Lasky, because she did not consider him trustworthy. The trustees nonetheless approved the proposed agreement with Lasky and EHPA (the "initial agreement"), which provided that, beginning October 1, 1991, the employees of EHPA's employer clients would be enrolled in the Fund and that EHPA would, on a monthly basis, collect and remit to the Fund the employers' contributions for those employees. A complementary agreement between EHPA and Local 119 permitted the employees of EHPA's clients to become members of Local 119.
 
 
 12
 From October 1991 to March 1994, Lasky timely collected the employer contributions and remitted them to the Fund. In April 1994, however, Merino was informed that Lasky had collected, but failed to remit to the Fund, approximately $475,517 in employer contributions for March and April 1994. Lasky, when confronted by Merino about the missing payments, initially insisted that the check was in the mail. A few days later, when the Fund still had not received such a check, Merino again confronted Lasky, who insisted that it must have been lost in the mail. Lasky promised to deliver a certified check for the full amount due the following day. The Fund never received either check.
 
 
 13
 Merino, not wanting to lose the new members Lasky had brought to the Fund, did not terminate the Fund's relationship with Lasky and EHPA but instead negotiated a repayment agreement with Lasky (the "April 1994 Agreement"), which was approved by the Fund's trustees. Under that agreement, Lasky executed a promissory note to the Fund in the amount of the embezzled contributions, plus 18 percent interest, and was to make payments over a period of 18 months, generally at the rate of $30,000 per month; as security, he executed in the name of EHPA and himself a confession of judgment in the amount of $475,517.23, and he gave the Fund a deed in trust for the home of his then-wife, a security agreement signed by her pledging that home as collateral for his debt, and a personal guarantee from his father, Gerald Lasky.
 
 
 14
 Merino did not consult the Fund's attorneys as to the legality of the April 1994 Agreement; nor did he heed the advice given him by Briand to terminate the Fund's relationship with Lasky and EHPA. And despite insisting on the above forms of security, Merino made no effort to ascertain what they were worth. He neither sought to determine the unencumbered value of the pledged home nor investigated the financial condition of EHPA, Lasky, or Lasky's father. In fact, the security, in comparison to the amount embezzled, was worth little: At trial it was revealed that Mrs. Lasky's home had approximately $60,000 of equity in 1994.... Lasky's own promissory note in the amount of $475,[517].23 was of dubious value. Although Lasky's 1994 tax return revealed an adjusted gross income of $359,180, he owned no property, stock, or cars. Lasky owed back taxes to the IRS, was supporting his 4 children from a prior marriage, and according to his then wife was struggling each month to make ends meet.... By 1995, Lasky's income dropped to $60,642. The personal guarantee of Gerald Lasky was not much better. It was given after his retirement and move to Florida to a condo which was likely judgment proof under Florida law. He was also being partially supported by his son at the time.
 
 
 15
 District Court 2003 Opinion at 8-9.
 
 
 16
 B. Briand Becomes Fund Administrator; Lasky Strikes Again
 
 
 17
 In August 1994, Briand replaced Merino as Fund Administrator. In April, as president of Local 119, she had been an observer at the Fund trustees' meeting in which the April 1994 Agreement was approved. She had expressed no view at that meeting as to the advisability of that agreement. She privately advised her husband Merino, however, that he should sever the Fund's relationship with Lasky and EHPA. Nonetheless, when Briand became Fund Administrator, she did nothing to sever the relationship with Lasky, "to rei[]n him in[,] or to protect the fund," District Court 2003 Opinion at 21.
 
 
 18
 Lasky made the repayments required by the April 1994 Agreement for less than a year. By March 1995, he had reduced the amount he owed the Fund to approximately $175,000, see District Court 2004 Order at 4, but he failed to make any further repayments with respect to the funds diverted in 1994. In addition, Lasky collected the March 1995 employer contributions and did not remit them to the Fund. The amount of this second embezzlement was approximately $177,271. See id. at 3.
 
 
 19
 Briand promptly contacted the employers, notifying them of the default, informing them that the Fund would no longer do business with EHPA, and arranging for many of the employers to make their contributions to the Fund directly. Briand sent Lasky a letter terminating the Fund's relationship with Lasky and EHPA and informing Lasky that the Fund would commence legal action if he did not remit the March 1995 contributions by the end of the month. Briand also instructed the Fund's attorneys to notify the United States Department of Labor of Lasky's default.
 
 C. The Decision of the District Court
 
 20
 The Secretary commenced the present action in 1998, alleging several causes of action against Merino, Briand, Lasky, and others. To the extent pertinent to the present appeal, the Secretary contended (1) that Merino and Briand breached their fiduciary duties of loyalty and care, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), by (a) allowing the Fund to enter into the initial agreement with Lasky, (b) allowing the Fund to enter into the April 1994 Agreement with Lasky, and (c) allowing Lasky to continue to collect employer contributions after his March-April 1994 diversion of employer contributions from the BIW Fund (first cause of action); (2) that Merino and Briand caused the Fund to engage in a prohibited transaction in violation of ERISA §§ 406(a)(1)(B) and (D), 29 U.S.C. §§ 1106(a)(1)(B) and (D), because the April 1994 Agreement constituted an extension of credit to Lasky for the repayment of the moneys he had diverted from the Fund (second cause of action); and (3) that Merino and Briand were liable under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), for Lasky's breaches of his fiduciary duty because their own breaches of the duties of loyalty and care enabled Lasky's thefts of Fund assets (sixth cause of action). The Secretary requested principally that Merino and Briand (1) be ordered to pay the Fund $352,271 to compensate for the losses caused by Lasky (comprising $175,000 as the unpaid balance of the money he diverted in March-April 1994, plus the $177,271 he diverted in March 1995), and (2) be permanently enjoined from working with or controlling the assets of any employee benefit plan.
 
 
 21
 Following proceedings before a district judge disposing of certain claims, the Secretary, Merino, Briand, and other undismissed defendants agreed that the remaining proceedings would be conducted before a magistrate judge. Following a bench trial, the magistrate judge found against Merino and Briand on the above three causes of action. To the extent pertinent to Briand, the court found as follows.
 
 
 22
 With respect to the first cause of action, for breach of the duties of loyalty and care, the court found that Briand had not been a fiduciary of the Fund prior to becoming the Fund Administrator in August 1994 and that she was not liable for the Fund's entering into either the initial agreement with Lasky in 1991 or the April 1994 Agreement. However, the court found that Briand, after becoming Fund Administrator, "breached her fiduciary duties by allowing Lasky to continue to collect employer contributions." District Court 2003 Opinion at 20. The court reasoned as follows:
 
 
 23
 At first glance, it seems reasonable that Briand would continue on the course of action adopted by the Trustees since Lasky was current with his payments as of August 1994. However, when Briand became the Fund Administrator, she was under a strict duty [to] use care, skill, prudence and diligence in ensuring from that point on that the Fund's assets were handled properly.... Briand knew everything that Merino knew about Lasky. She knew that Lasky had embezzled welfare funds in the past, had improperly withheld employer contributions from NOITU, that NOITU dropped local 119 because of the Lasky agreement, that Lasky misappropriated BIW funds and lied to Merino when questioned about the funds, and she must have learned that Lasky lied about being bonded since no bond was available to secure the loss. In light of this history, the probability that Lasky would renege on his agreement and divert future contributions was exceedingly high. Just as it was imprudent for Merino to allow Lasky to continue to collect contributions after April of 1994, when Briand stepped in and assumed fiduciary duties, she too had an obligation to act in the best interests of the fund, which included an evaluation of the fund's relationship with Lasky. Briand acknowledged that she considered Lasky to be untrustworthy and believed that the Fund should not be engaged in business with EHPA "under any circumstances." (Briand Depo. at 80). Indeed she counseled her husband, Merino, to terminate the EHPA agreement in April 1994. Yet, despite everything she knew and believed about Lasky, Briand did nothing to rei[]n him in or to protect the fund. Had she simply raised her objections with the other trustees, or alerted EHPA employers of the problem and made different payment arrangements, or sought enforcement of the Fund's agreement with EHPA which required that EHPA establish a three month reserve to protect against future delinquencies, or even demanded a bond from Lasky which he was required to provide, she might have avoided what next occurred. Briand's silence and failure to take any action to protect the fund fell far short of the duties she assumed as a fiduciary and led to the loss the Fund experienced in 1995 when Lasky struck again.
 
 
 24
 District Court 2003 Opinion at 20-21 (internal quotation marks omitted); see also District Court 2004 Order at 3 ("... Briand's failure to take any steps to rei[]n in Lasky once she became a [fiduciary] permitted Lasky to strike again in March 1995 leading to a loss of $177,271. The fund thus suffered a loss of $177,271 as a direct result of Briand's failure to exercise care in the performance of her duties.").
 
 
 25
 As to the second cause of action, for causing the Fund to engage in a prohibited transaction, i.e., the April 1994 Agreement, the court concluded that "Briand was under an obligation to revisit the fund's relationship with Lasky, including the payout agreement." District Court 2004 Order at 4. However, the court was
 
 
 26
 unable to conclude based upon the evidence presented at trial that Briand's failure to seek rescission of the payout agreement once she became a fiduciary further damaged the fund. Indeed, the evidence indicates that Lasky had virtually no tangible assets and that prompt remedial action on Briand's part would not have materially improved the fund's position.
 
 
 27
 Id. Accordingly, the court found that Briand should be held liable only for the $177,271 that Lasky embezzled from the Fund after she became Fund Administrator, not for the unrepaid $175,000 from Lasky's March-April 1994 embezzlement.
 
 
 28
 Finally, as to the sixth cause of action, the court concluded that Briand's violation of her duties of loyalty and care had enabled Lasky's second embezzlement:
 
 
 29
 Although Briand became a fund trustee after Lasky had already withheld $475,000 from the fund, she did nothing to change the relationship. Briand knew that Lasky could not be trusted. She was of the view that the fund should not be doing business with EHPA. She knew that Lasky had on three earlier occasions wrongfully withheld employer contributions from a benefit fund. Her failure to restrict, or monitor Lasky in any way permitted him to steal a second time from [the] BIW [Fund]. When Briand became the Fund Administrator, she could have sought termination of the relationship with Lasky, attempted to arrange for direct payment of employer contributions to the Fund, insisted on the bond required by the trust agreement, demanded that a reserve be established consistent with the collective bargaining agreement, demanded that the contributions be placed in an escrow account immediately upon receipt instead of permitting Lasky to retain unfettered control over the funds for several weeks as provided for under existing agreements. Briand also had many tools available to her and plenty of time to prevent Lasky's breach. Instead, she did nothing. By failing to change a thing or insist on any safeguards, Briand effectively enabled Lasky to divert employer contributions in March 1995.
 
 
 30
 District Court 2003 Opinion at 28-29.
 
 
 31
 The final judgment, as ultimately amended, ordered in pertinent part
 
 
 32
 that defendant, Sandra Briand, is jointly and severally liable with the co-defendants for the amount of $177,271; that defendant, Joseph Merino, is jointly and severally liable for the full principal amount of $352,271; ... and that defendants, Joseph Merino and Sandra Briand, are barred from ever serving as fiduciaries or service providers of any employee benefit plan.
 
 
 33
 Second Amended Judgment dated February 13, 2004, at 1-2.
 
 II. DISCUSSION
 
 34
 On appeal, Briand contends principally that the district court erred in concluding that she breached her fiduciary duties under ERISA by failing to protect the Fund from Lasky's March 1995 embezzlement. She also argues that even if that conclusion was correct, the court erred in finding that her breach resulted in losses to the Fund; and she contends that the court abused its discretion in permanently barring her from serving as an ERISA fiduciary. For the reasons that follow, we reject her contentions.
 
 A. Breach of Briand's Fiduciary Duties
 
 35
 ERISA § 404(a) imposes on ERISA plan fiduciaries the "[p]rudent man standard of care." 29 U.S.C. § 1104(a). Section 404(a)(1) states that the fiduciary must discharge his duties "solely in the interest of the [ERISA plan] participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and must do so
 
 
 36
 with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims,
 
 
 37
 id. § 1104(a)(1)(B).
 
 
 38
 "Prudence," as required by ERISA, "is measured according to the objective prudent person standard developed in the common law of trusts." Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir.) ("Katsaros") (internal quotation marks omitted), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). Thus, "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are those of trustees of an express trust-the highest known to the law." Donovan v. Bierwirth, 680 F.2d 263, 272 n. 8 (2d Cir.) ("Bierwirth I"), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).
 
 
 39
 If a fiduciary was aware of a risk to the fund, he may be held liable for failing to investigate fully the means of protecting the fund from that risk. See generally Bierwirth I, 680 F.2d at 273-76. Further,
 
 
 40
 the common law of trusts . . . imposes a duty on a successor trustee to remedy the breach of a prior trustee, and imposes liability for breach of this duty "to the extent to which a loss results from [the successor trustee's] failure to take such [remedial] steps."
 
 
 41
 Silverman v. Mutual Benefit Life Insurance Co., 138 F.3d 98, 104 (2d Cir.) (quoting Restatement (Second) of Trusts § 223(2) comment d (1959) (emphases ours)), cert. denied, 525 U.S. 876, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998).
 
 
 42
 Because the fiduciary's obligation is to exercise care prudently and with diligence "under the circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), his actions are not to be judged "from the vantage point of hindsight," Katsaros, 744 F.2d at 279 (internal quotation marks omitted). Further, so long as the "prudent person" standard is met, ERISA does not impose a "duty to take any particular course of action if another approach seems preferable." Diduck v. Kaszycki & Sons Contractors, Inc., 874 F.2d 912, 917 (2d Cir.1989).
 
 
 43
 In the present case, Briand contends that the district court erred in finding that she breached her fiduciary duties to the Fund, arguing principally that, when she became a fiduciary in August 1994, Lasky was in compliance with the April 1994 Agreement, and that when he again embezzled employer contributions in March 1995, Briand took immediate and decisive action to terminate his relationship with the Fund. This argument misses the point, for the district court did not fault Briand for the actions she took after Lasky's March 1995 embezzlement; rather, the court ruled that she had an obligation upon becoming a Fund fiduciary in August 1994 to take precautionary steps to limit Lasky's ability to embezzle from the Fund again.
 
 
 44
 Although Briand suggests that this ruling judged her performance by hindsight, that contention is belied by the record. The court found that Briand "knew that Lasky had on three earlier occasions wrongfully withheld employer contributions from a benefit fund" and "that Lasky could not be trusted." District Court 2003 Opinion at 28. The record easily establishes that Briand had this knowledge while she was president of Local 119, before she became the Fund Administrator. For example, Briand testified at her deposition that she knew even prior to the Fund's entering into its initial agreement with Lasky that Lasky had been convicted of embezzling moneys from an employee benefit fund. (See, e.g., Deposition of Sandra Briand at 69.) Prior to becoming a Fund fiduciary, she was aware that NOITU had severed its relationship with Lasky because of Lasky's embezzlement of employer contributions from NOITU; she had attended a meeting with, among others, Lasky's uncle, Daniel Lasky, who advised against Local 119's having any dealings with Lasky. (See id. at 80-81, 83.) She testified that, at that meeting, "I made very clear at the time that I did not think it was a good idea to engage in business with the EHPA under any circumstances." (Id. at 80 (emphasis added); see also id. at 84 ("I just didn't think that he was a trustworthy person.").)
 
 
 45
 Obviously, Lasky did not prove Briand's opinion wrong. And when Lasky embezzled $475,517 from the Fund in March and April 1994, Briand advised Merino to terminate the Fund's relationship with him. (See id.) Thus, as the district court found, by the time Briand became Fund Administrator in August 1994, she was well aware that on three occasions Lasky had embezzled from three employee benefit funds many hundreds of thousands of dollars. And, as the district court found, Briand must have known that Lasky had lied to Merino about complying with the requirement in the initial agreement that Lasky and EHPA be bonded, because there in fact was no bond to which the Fund could look for reimbursement for Lasky's 1994 embezzlements.
 
 
 46
 Briand argues that she had no duty to take any particular course of action, and that she thought it preferable not to "rock the boat" in August 1994, given that Lasky had been making repayments pursuant to the April 1994 Agreement (appellants' brief on appeal at 18). Leaving aside the fact that as a practical matter, this meant that, "despite everything she knew and believed about Lasky, Briand did nothing to rei[]n him in or to protect the fund," District Court 2003 Opinion at 21, we cannot conclude that pursuing Lasky's performance of the April 1994 Agreement was an option permitted by ERISA. The district court correctly ruled that the April 1994 Agreement between the Fund and Lasky, permitting Lasky to repay the first embezzled sum over a period of 18 months, constituted an extension of credit to Lasky and hence was a prohibited transaction within the meaning of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B). Although Briand was not a Fund fiduciary at the time that that agreement was entered into, she violated § 406(a) after she became Fund Administrator because she allowed that extension of credit to continue.
 
 
 47
 Finally, while Briand contends that the steps the district court suggested she could have taken were speculative, she has not pointed to any evidence indicating that she even investigated ways to protect the Fund, and we see nothing conjectural about the range of steps pointed out by the court. For example, a simple demand that Lasky post a bond would merely have required that he comply with an obligation imposed on him by the initial agreement. And, at the other end of the spectrum, termination of the relationship with Lasky was precisely what Briand herself had urged upon Merino.
 
 
 48
 In sum, we see no error in the district court's conclusion that Briand's inaction between August 1994 and March 1995 constituted a breach of her duties under ERISA. Knowing—and having expressed the prudent view more than once—that Lasky could not be trusted, Briand did not exercise reasonable care when she simply proceeded to trust him.
 
 
 49
 B. Loss to the Fund Resulting from Briand's Breach
 
 
 50
 Briand also argues that even if she did breach her fiduciary duties to the Fund, the district court erred in determining that that breach resulted in losses to the Fund within the meaning of ERISA § 409(a). That section provides, in relevant part, that
 
 
 51
 [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ....
 
 
 52
 29 U.S.C. § 1109(a) (emphasis added).
 
 
 53
 Briand contends that her breach caused the Fund no losses because the claims of all plan beneficiaries were paid, thanks to voluntary additional contributions by employers, along with moneys provided by NOITU, with which the Fund, because of its financial straits, merged. We have several difficulties with this argument.
 
 
 54
 First, there can be no serious question that Briand's failure to take any steps to forestall Lasky's second embezzlement from the Fund, thereby allowing Lasky to collect the March 1995 employer contributions and to fail to remit them to the Fund, caused the Fund a loss of $177,271. The issue Briand raises is instead whether she is entitled to have a setoff, against the loss that she caused, of any amounts that the Fund received in gifts from third parties for the benefit of plan participants and beneficiaries. Setoffs may be rational in some circumstances. For example, in New York State Teamsters Council Health & Hospital Fund v. Estate of DePerno, 18 F.3d 179, 182-83 (2d Cir.1994), we held that ERISA trustees who had breached their fiduciary duties by using fund assets to hire parties in interest could prove their entitlement to a setoff by showing that the expenditure was "fair and reasonable under all of the circumstances," id. at 183 (internal quotation marks omitted). But we see no rational basis for a setoff here, for there could be no possibility that any part of Lasky's embezzlement was fair and reasonable; and there is no basis for a finding that it was fair and reasonable for employers and NOITU to be asked to make donations to the Fund in order to compensate for the loss caused by Briand's breach of her fiduciary duties. As the district court reasoned, Briand
 
 
 55
 should not be permitted to escape liability because [her] victims may have made double contributions to make up for some of the losses [she] caused .... The underlying purposes of ERISA would not be furthered by awarding an errant fiduciary credit for [double] contributions made by an employer or others concerned about continuing health care coverage for employees.
 
 
 56
 District Court 2003 Opinion at 31.
 
 
 57
 Second, Briand's contention that because of the gifts the Fund received from employers and NOITU in the aftermath of Lasky's second embezzlement, all claimants were paid, is doubly flawed. Although the ultimate goal of ERISA § 409(a) is "the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust," Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir.1985) ("Bierwirth II"), the express language of that section makes the breaching fiduciary liable not directly for losses to beneficiaries, but for "losses to the plan," 29 U.S.C. § 1109(a) (emphasis added). In addition, the record does not support Briand's contention that all claims by beneficiaries were paid. The district court found that NOITU had agreed to pay claims dating back only to March 1996 and that there was no evidence that earlier claims had been paid. Briand has not pointed to any evidence to show that that finding is clearly erroneous.
 
 
 58
 Briand's other arguments in opposition to the monetary portion of the judgment, including her contention that she should pay nothing because during her tenure as Fund administrator, Lasky repaid more of the first embezzled sum than he stole in his second embezzlement, so that the Fund ultimately benefited from her breach, are meritless and do not warrant discussion.
 
 C. The Injunction
 
 59
 ERISA § 409(a) also provides that a fiduciary who breaches her duty to a plan "shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a). "[I]t is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries." Katsaros, 744 F.2d at 281; see, e.g., Marshall v. Snyder, 572 F.2d 894, 901 (2d Cir.1978). That relief may include a permanent injunction barring a former ERISA fiduciary from providing services or acting as a fiduciary to any employee benefit plan in the future. See, e.g., Beck v. Levering, 947 F.2d 639, 641 (2d Cir.1991), cert. denied, 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992). We review the district court's fashioning of equitable remedies under ERISA for abuse of discretion. See, e.g., Katsaros, 744 F.2d at 281.
 
 
 60
 Briand contends that the district court abused its discretion in entering a permanent injunction barring her from ever again serving as a fiduciary or service provider to any employee benefit plan, arguing that she had acted in good faith in a manner she believed to be in the best interests of the Fund, and had, at worst, made the wrong decision in a difficult situation. She points out that the defendants in Beck v. Levering had personally profited from their fiduciary breach, whereas there was no such allegation against her here.
 
 
 61
 The issuance of a permanent injunction is not limited to cases in which the fiduciary has engaged in self-dealing. Section 409(a) is intended to be remedial and protective, and the court must determine the appropriateness of such a remedy in light of all the circumstances of the case. Here, the district court was presented with copious evidence that Briand knew full well that Lasky had embezzled money from three employee benefit funds, including the BIW Fund; that Lasky repeatedly lied when it suited him; that his own uncle's fund refused to do business with Lasky and EHPA any more; that the uncle said Lasky's word was not to be trusted and advised Briand's union and the BIW Fund not to have dealings with Lasky; that Briand herself had repeatedly counseled others against dealing with Lasky because, in her own words, she "did not think it was a good idea to engage in business with the EHPA under any circumstances"; and that notwithstanding her knowledge and that categorical opinion, Briand became a fiduciary who sat back and did nothing to protect the Fund from Lasky until he had looted it a second time. We cannot say that the entry of a permanent injunction, protecting other funds against the possibility of Briand's derelictions in the face of overwhelming grounds for prudence, was an abuse of discretion.
 
 CONCLUSION
 
 62
 We have considered all of Briand's arguments on this appeal and found them to be without merit. The judgment of the district court is affirmed.