## DYKEMA GOSSETT PLLC v AJLUNI

Docket No. 259218. Submitted October 10, 2006, at Detroit. Decided November 16, 2006, at 9:00 a.m. Leave to appeal sought.

Dykema Gossett PLLC brought an action in the Wayne Circuit Court against Roger M. Ajluni, M.D.; Medical Fitness Center; and RMA Physicians, P.C., seeking payment for legal services and costs in connection with Dykema's representation of Ajluni and the other defendants in an earlier suit they had brought against Blue Cross Blue Shield of Michigan (BCBSM). For the prior suit, Dykema had negotiated a retainer agreement that combined hourly billing and a contingent-fee arrangement. During the course of that suit, Dykema became concerned about further BCBSM investigations of Ajluni's billing practices and the problems they presented with regard to Ajluni's testimony and the possibility of criminal charges against him. After Dykema negotiated a settlement of the BCBSM lawsuit, the defendants refused to pay, and this action followed. The jury found that Ajluni and the other defendants were liable to Dykema for breach of contract on a quantum meruit basis and for fraud or misrepresentation. The court, Warfield Moore, Jr., J., denied the defendants' motion for judgment notwithstanding the verdict or a new trial, but granted remittitur and reduced the jury's award. The defendants appealed, and Dykema cross-appealed.

The Court of Appeals *held*:

1. The trial court did not err by denying the defendants summary disposition of Dykema's quantum meruit claim. While quantum meruit is generally not an appropriate remedy when an express contract is breached, an attorney retained with a contingent-fee arrangement who is wrongfully discharged or who withdraws with good cause is entitled to compensation for the reasonable value of the attorney's services under quantum meruit rather than the contingent-fee agreement. Neither party terminated this contract, and Dykema performed its obligation under the contract. When it became clear to Dykema that Ajluni's fraudulent billing practices had caused it to offer a false theory of damages in the BCBSM litigation, however, Dykema arguably had reasonable grounds to withdraw from that case. Had it done so, it

could have recovered under a quantum meruit theory. Precluding recovery because Dykema did not abandon its clients' cause but worked out a settlement on their behalf is unfair. If a client actively prevents the occurrence of an event that gives rise to an attorney's recovery under a contingent-fee agreement, the attorney has a right to recover under a quantum meruit theory.

2. The trial court did not err by granting Dykema's motion for a directed verdict. A directed verdict is proper only when no factual question exists on which reasonable minds may differ. Dykema fully performed its obligation by bringing the BCBSM litigation to a settlement, which gave rise to the defendants' obligation to pay under a clause of the agreement requiring the parties to agree on a fair value for services in the event of a nonmonetary resolution of the case. The defendants breached the contract by refusing to pay or even discuss what constituted fair value.

3. None of the defendants' claims of evidentiary errors is sufficient to merit a new trial. The trial court did not abuse its discretion by admitting evidence regarding Dykema's pro bono work or allowing questioning about other lawsuits to which Ajluni was a party. Moreover, the trial court correctly ruled that the defendants could not challenge the validity of the economic-damages theory presented in the BCBSM litigation. Judicial estoppel prevents a party from taking a position in a proceeding that is inconsistent with a position the party successfully took in a prior proceeding. The settlement between BCBSM and the defendants in the prior suit was a bargain made with a prior tribunal. Despite the fact that the prior proceeding ended by settlement rather than litigation to its conclusion, the "prior success rule" of judicial estoppel thus precluded the defendants from challenging that theory of damages in this case.

4. While the trial judge should be cautioned concerning his sometimes inappropriate courtroom commentary, the defendants were not prejudiced by it. The defendants have taken many of the challenged comments out of context, while others reflect a conversational style that neither favored nor disfavored any party or witness. Moreover, had defense counsel objected at trial, they might have minimized the commentary.

5. The trial court did not err by summarily dismissing the defendants' claim for legal malpractice. The malpractice alleged was that Dykema failed to disclose that the defendants would still owe legal fees after the BCBSM settlement. This was immaterial to the outcome of the BCBSM suit itself, and the defendants did not show that, but for the attorney's alleged malpractice, they would have been successful in the underlying suit.

6. The trial court abused its discretion by granting remittitur. In determining whether remittitur is appropriate, a trial court must decide whether the evidence supported the jury's award. The court must base this determination on objective criteria relating to the actual conduct of the trial or the evidence presented, such as whether the verdict was influenced by bias or prejudice. While the trial court apparently believed that the jury awarded excessive damages because of a bias against Ajluni, this belief is not a basis for remittitur. The jury award was not so excessive as to fall outside the range of outcomes supported by the evidence presented to the jury.

7. The trial court erred by ruling that the interest on the attorney fees awarded as sanctions for the defendants' rejection of the mediation settlement should be calculated from the date of the rejection. Under MCL 600.6013(8), that interest is calculated from the date of filing the complaint.

Jury verdict affirmed, remittitur order reversed, and case remanded for reinstatement of jury award and recalculation of interest.

JANSEN, J., concurring in part and dissenting in part, concurred in the majority's result, but, because the defendants breached the parties' express contract, would not reach the issue whether recovery was alternatively justified under the equitable doctrine of quantum meruit. The contract expressly contemplated quantum-meruit-like recovery, irrespective of the applicability of that equitable remedy. Accordingly, Judge JANSEN dissented from the majority's announcement of a new rule of law regarding the applicability of quantum meruit in the context of legal-fee recovery.

1. CONTRACTS — REMEDIES — QUANTUM MERUIT — ATTORNEY AND CLIENT.

An attorney retained with a contingent-fee arrangement who is wrongfully discharged or who withdraws from the case for good cause is entitled to compensation for the reasonable value of the attorney's services under quantum meruit rather than the contingent-fee agreement; if a client actively prevents the occurrence of an event that gives rise to an attorney's recovery under the contingent-fee agreement, the attorney also has a right to recover under a quantum meruit theory.

2. ACTIONS — PARTIES — JUDICIAL ESTOPPEL.

Judicial estoppel prevents a party from taking a position in a proceeding that is inconsistent with a position the party successfully took in a prior proceeding; the mere assertion of inconsistent

positions is not sufficient to invoke the doctrine; rather, there must be some indication that the court in the earlier proceeding accepted the party's position as true; judicial estoppel is limited to situations in which a party attempts to invoke a second tribunal's authority to override a bargain made with a prior tribunal.

3. INTEREST — JUDGMENTS — MEDIATION SANCTIONS.

Interest on all parts of a judgment, including attorney fees and costs ordered as mediation sanctions, is calculated from the date of filing the complaint (MCL 600.6013[8]).

*Stark Reagan, P.C.* (by *Ava K. Ortner* and *Peter L. Arvant*), for the plaintiff.

*Mark Granzotto, P.C.* (by *Mark Granzotto*), for the defendants.

Before: BORRELLO, P.J., and JANSEN and COOPER, JJ.

COOPER, J. Defendants[1] appeal an order of judgment entered after a jury trial; plaintiff Dykema Gossett PLLC cross-appeals an order of remittitur modifying the jury's award of damages.

I. FACTS AND PROCEDURAL HISTORY

This suit arises from Dykema's representation of Ajluni in a suit Ajluni brought against Blue Cross Blue Shield of Michigan (BCBSM).[2] BCBSM began investigating Dr. Ajluni in 1991, and federal investigators conducted an examination of Dr. Ajluni's billing in 1993. As a result of these investigations, in 1997 Dr. Ajluni entered into a pretrial diversion agreement with the United States Attorney's office whereby prosecution of Dr. Ajluni was deferred and the doctor paid

---

[1] Defendant Dr. Ajluni is the principal owner of defendants RMA Physicians, P.C., and the Medical Fitness Center (MFC). For ease of reference, the three defendants will be collectively referred to as Ajluni.

[2] *Ajluni v BCBSM,* Wayne Circuit Court Docket No. 98-828253-CK.

restitution to BCBSM for improper charges in the amount of $12,500. Two months later, BCBSM "departicipated" Dr. Ajluni from its programs, meaning Dr. Ajluni could no longer bill Blue Cross directly for services to patients covered by Blue Cross.[3] Dr. Ajluni appealed this decision to Blue Cross, but his appeal failed.

On August 17, 1998, Dr. Ajluni[4] retained plaintiff[5] to represent him in a suit against BCBSM. According to the trial testimony of Dykema attorney Joseph Erhardt, who worked with Young on the BCBSM litigation, Dykema rarely works on contingency; however, due to the prior working relationship between Young and Pastore, the parties negotiated a retention agreement that was a mixed hourly and contingency fee agreement. Pastore advised Ajluni in this negotiation. The agreement specified that work would be billed on an hourly basis at half the normal billing rate, up to a maximum of $50,000, and Dykema would receive 25% of any net monetary recovery realized by Dr. Ajluni. The agreement also stated: "If there is a resolution of the litigation which involves something other than a cash payment, fair value will be given for the benefit based on an agreement to be reached between you and the Dykema firm."

Ajluni's complaint against BCBSM alleged that BCBSM had breached its provider agreement by wrongfully departicipating Dr. Ajluni from the BCBSM program, and defamed him by erroneously stating that he

---

[3] RMA (the clinic) and the other doctors who worked for RMA remained in the BCBSM program and were still able to bill directly.

[4] RMA and MFC were added as plaintiffs in the suit against BCBSM in May 1999, at BCBSM's request.

[5] Dr. Ajluni's son-in-law, Tom Pastore, had worked with Donald Young while employed as an attorney with Dykema Gossett; Young was the lead attorney representing Ajluni.

had been charged, tried, and convicted for his wrongful billing practices. Ajluni's damages expert[6] projected total economic damages over the course of Ajluni's remaining career as $1.9 million. Ajluni anticipated an additional $1.9 million in non-economic damages from the defamation claim.

According to the trial testimony of Erhardt and Young, four weeks into the trial, Dykema learned that BCBSM was again investigating Dr. Ajluni's billing practices. Because he had been departicipated, Dr. Ajluni could not bill BCBSM directly for services to patients. BCBSM investigators discovered by interviewing some of Dr. Ajluni's patients that the clinic RMA had billed for services to some patients under another RMA doctor's billing number when in fact Dr. Ajluni had been the treating physician. This process of billing for Dr. Ajluni's services under another doctor's billing number had apparently been done for about 18 months. Believing that these improper billing practices could expose their client to criminal fraud charges, and at a minimum rendered invalid the damages theory they had presented to the jury, Young and Erhardt discussed with Dr. Ajluni the possibility of pursuing a settlement with BCBSM. Dr. Ajluni agreed. Young and Erhardt further discussed the issue of the improper billing with Howard (Buck) O'Leary, Jr., a white collar crime attorney in Dykema's Washington, D.C., office. According to O'Leary's trial testimony, criminal charges would be a likely outcome if these billing practices were brought to the attention of state or federal prosecutors, particularly given the fact that Dr. Ajluni had previously signed a pretrial diversion agreement related to improper billing.

---

[6] Robert McAuliffe, a certified public accountant retained by Dykema on Ajluni's behalf.

Young and Erhardt testified that, in discussion with BCBSM's counsel, it became clear to Dykema that BCBSM and its counsel were aware of the improper billing practices, and that Dr. Ajluni would be recalled as a witness and questioned about them.[7] Young and Erhardt realized that if their client were recalled, he would either have to lie or to admit to failure to comply with BCBSM's billing regulations, that is, admit to fraud. To prevent this, Dykema negotiated a settlement by which Ajluni dropped all claims against BCBSM, and BCBSM dropped all counterclaims[8] and agreed not to turn over to authorities the information it had gathered about Dr. Ajluni's billing of services using another doctor's name. Dr. Ajluni agreed to and signed the Confidential Settlement Agreement and Release of Claims.

Dykema requested payment from Ajluni for costs and services incurred in the BCBSM litigation, nearly four years of representation. Ajluni refused to pay. Dykema filed the complaint that underlies this appeal, alleging: Count I, breach of contract, obligation to pay in the event of a non-cash resolution; Count II, breach of contract, obligation not to hinder performance; Count III, quantum meruit; Count IV, fraud, intentional misrepresentation; Count V, negligent misrepresentation; and Count VI, innocent misrepresentation.

The jury found that defendants were liable to plaintiffs for breach of contract on a quantum meruit basis; that defendants were liable for fraud and/or misrepresentation; and that the total amount of damages due plaintiff from defendants was $700,000.

---

[7] The trial testimony of Dickinson Wright attorney Kathryn Wood, who represented BCBSM in the litigation brought by Ajluni, confirms this.

[8] BCBSM's claims included a $76,000 counterclaim for reimbursement of monies paid to Ajluni for unnecessary medical tests, and $368,000 in mediation sanctions.

Defendants filed a motion for judgment notwithstanding the verdict (JNOV) or for a new trial. Judge Warfield Moore, Jr., denied the motion for JNOV or a new trial, but remitted the jury award from $700,000 to $500,000. Defendants filed this appeal, and plaintiff cross-appealed the court's remittitur of the jury's award.

## II. PLAINTIFF'S QUANTUM MERUIT CLAIM

Defendants first argue on appeal that the trial court erred in denying a pretrial motion defendants had filed under MCR 2.116(C)(8) and (10) seeking summary disposition of plaintiff's quantum meruit claim.

We review de novo the grant or denial of a motion for summary disposition. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998). A motion brought under MCR 2.116(C)(8) relies only on the pleadings, taking all factual allegations as true, and testing the legal sufficiency of the claim; summary disposition is proper where no factual development could support relief under the claim. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). A motion brought under MCR 2.116(C)(10) tests the factual sufficiency of a claim, relying on pleadings, affidavits, depositions, and other documentary evidence; summary disposition is proper only where no genuine issue of material fact exists. *Id.* at 120.

Defendants argue that the quantum meruit claim should have been dismissed because it is not an available remedy where there is an express contract. Defendants are correct that where an express contract exists, a contract will not be implied. *Scholz v Montgomery Ward & Co, Inc*, 437 Mich 83, 93; 468 NW2d 845 (1991). And where an express contract is breached, quantum meruit is still inappropriate: "Where the plaintiff relies on breach of an express contract there can be no

recovery on *quantum meruit.*" *Geistert v Scheffler*, 316 Mich 325, 335; 25 NW2d 241 (1946); see also *Borisoff v Schatten*, 335 Mich 684, 686; 57 NW2d 430 (1953); *Shurlow Tile & Carpet Co v Farhat,* 60 Mich App 486, 491; 231 NW2d 384 (1975).

However, where the contract is for legal services as opposed to other services, such as construction contracts, quantum meruit seems to be interchangeably used to mean both the reasonable value of services rendered and the appropriate remedy for an implied contract. Despite that ambiguity, where there is an express contract for legal services, prior caselaw in Michigan suggests that quantum meruit has been an available remedy only if the express contract is expressly terminated by either party. See, e.g., *Ambrose v Detroit Edison Co,* 65 Mich App, 484, 491; 237 NW2d 520 (1975) ("[A]n attorney on a contingent fee arrangement who is wrongfully discharged, or who rightfully withdraws, is entitled to compensation for the reasonable value of his services based upon *quantum meruit*, and not the contingent fee contract."). Here, however, neither party in fact terminated the contract. By continuing the representation through to the settlement, Dykema fully performed its obligation under the binding and valid contract, which was to represent defendants to the completion of the lawsuit.

We note that when it became clear to Dykema that Dr. Ajluni's fraudulent billing practices had caused it to proffer a false theory of damages to the jury in the BCBSM litigation, Dykema arguably had reasonable grounds to withdraw from the case. Had it done so, it would clearly be positioned to recover under a quantum meruit theory. "An attorney retained on a contingent fee arrangement who withdraws from a case for good cause is entitled to compensation for the reasonable

value of his services based upon quantum meruit, and not the contingent fee contract." *Ecclestone, Moffett & Humphrey, PC v Ogne, Jinks, Alberts & Stuart, PC,* 177 Mich App 74, 76; 441 NW2d 7 (1989). To preclude recovery because the Dykema attorneys did not abandon their client's cause, but instead worked out a settlement on his behalf, seems unfair.

During jury instructions at the close of the trial, Judge Moore instructed the jury that "[w]hen a client, any client, prevents the attorney from obtaining the contingent fee under the terms of a contingent fee agreement, the attorney is entitled to payment under what we call a quantum meruit theory." We find this is a reasonable extrapolation[9] of the existing caselaw suggesting that if an attorney has good cause to withdraw, the attorney is entitled to damages in quantum meruit. We therefore here hold that where a client actively prevents the occurrence of an event that triggers an attorney's recovery under a contingent fee agreement, the attorney has a right to recover on a quantum meruit theory.

### III. PLAINTIFF'S DIRECTED VERDICT MOTION

Defendants next argue the trial court erred in granting in part plaintiff's motion for a directed verdict at

---

[9] We note that if we did find the trial court's ruling was error, because the quantum meruit count was just one of the theories pled by plaintiff, and the jury found liability both on the breach of contract theory and the fraud theory rather than any implied contract damages theory, this error would be harmless. See MCR 2.613(A): "An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice."

trial. This Court reviews de novo the grant or denial of a motion for a directed verdict. The trial court must consider the evidence in the light most favorable to the nonmoving party and make all reasonable inferences in favor of the nonmoving party; a directed verdict is proper only when no factual question exists upon which reasonable minds may differ. *Meagher v Wayne State Univ,* 222 Mich App 700, 708; 565 NW2d 401 (1997) (citations omitted).

First, defendants argue that the trial court erroneously directed the jury that two of the five elements of fraud had to be found in favor of plaintiff. However, a review of the trial transcript indicates the defendants have taken the comments at issue out of context. Defendants' argument focuses on the point at which the judge was explaining to the jury what the elements of fraud entail, rather than on the judge's instructions to the jury. For example, explaining that one element of the fraud claim required the jury to find that a defendant made a material misrepresentation, the judge said: "Defendant did this." Read in context, it is clear that the judge meant the jury must find that defendant did this in order to find that element of the fraud claim satisfied. The judge's instructions to the jury clearly indicate what the jury is directed to find, and the fraud elements complained of by defendant do not appear in those instructions:

> The Court has made the following findings of fact which you are required to follow:
>
> The Court has determined that the Ajluni versus Blue Cross Blue Shield lawsuit, which we have called the Blue suit, came to a conclusion as a direct result of the conduct of the Defendant in reference to the disclosures which have been talked about and displayed here in the evidence in the court.

Therefore, this Court instructs you that I have con-
cluded that the Defendants by virtue of that breached their
contract with Dykema and, therefore, Defendants are
liable to Dykema for damages for breach of contract in an
amount that you decide, whatever amount that you decide
they are entitled to.

*   *   *

But as to whether the Plaintiff in this case, the Dykema
firm, has a right to damages, again, I am not making and
want to make it emphatic that I am not making a decision
that [sic].

That is the decision, ladies and gentlemen, you shall
make and you shall decide if they're entitled to it either
because of the fraud claims and/or because of the breach of
contract claims. But again, it would only be one award.

In addition, the verdict form that the jury was given
included three specific questions, and only the question
concerning breach of contract had a pre-printed answer
directed by the judge:

QUESTION NO. 1: Are the defendants liable to Plaintiff
for breach of contract on a *Quantum Meruit* basis?

ANSWER TO NO. 1: YES [pursuant to the Court's
directed verdict]

QUESTION NO. 2: Are the defendants liable to Plaintiff
for fraud and/or misrepresentation?

ANSWER TO NO. 2: _____ (yes or no)

What is the total amount of damages due Plaintiff from
Defendants?

$ _____ (total amount of damages)

Next, defendants argue they should have been al-
lowed to argue at trial that plaintiff should have known
about Dr. Ajluni's billing practices, because such argu-
ment suggests plaintiff's reliance on Dr. Ajluni's mis-
representations was not reasonable, and thus under-

mines this critical element of the fraud claim. We note first that the jury was aware of the fact that plaintiff represented defendants throughout this litigation, that plaintiff took depositions of everyone involved in the billing scheme and plaintiff's attorneys in general apprised themselves of how the system worked; the jury could have reached the conclusion that plaintiff should not reasonably have relied on defendants' misrepresentations based on the evidence that was presented. It did not do so, and we cannot see how Dr. Ajluni was prejudiced by being denied the opportunity to argue that his attorneys should have been aware that he was lying to them throughout the litigation. In addition, the trial court found that this line of argument was precluded because it was an affirmative defense theory and was not properly pled and could not therefore be argued. Defendants have made no argument to contradict this ruling.

Defendants argue that the court erred in directing the jury that defendants had breached the contract because this finding was based on an obligation between contracting parties not to hinder or make impossible the fulfillment of the contract, and the contract between these parties included no such obligation. Although defendants are correct that their contract included no such express provision, it seems logical to conclude that the purpose of a contract for legal representation is frustrated from the outset unless the party seeking representation assumes an obligation to refrain from interfering. However, speaking legally rather than logically, the common law is no help to plaintiff here, because "Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." *Fodale v Waste Mgt of Michigan, Inc*, 271 Mich App 11, 35; 718 NW2d 827 (2006), citing *Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 476; 666 NW2d 271 (2003).

A review of the trial transcript clearly indicates that the trial judge was correct in his conclusion that the BCBSM litigation "came to a conclusion as a direct result of the conduct of the Defendant." He was incorrect, however, in finding that this fraudulent conduct constituted a breach of contract, because the contract between the parties was silent as to any obligation of the client to generally deal in good faith, or specifically to refrain from lying to the attorney about even the essential elements of the cause of action. However, we find this error was harmless because the jury found defendants liable on the fraud theory as well, and the damage award is supportable on either alternative ground of breach of contract or fraud.

In any case, we further find that the contract was breached, just not for the reasons the trial court found. Dykema fully performed its obligation to bring Ajluni's litigation to a conclusion, that conclusion being the settlement. Dykema's full performance triggered Ajluni's contractual obligation to pay under the contract clause requiring the parties to agree on "fair value" in the event of a non-cash resolution. Ajluni did not pay, and refused even to engage in a discussion about fair value, at which point the contract was breached.

### IV. DEFENDANTS' CLAIM OF ERRONEOUS EVIDENTIARY RULINGS

Defendants argue several evidentiary errors require reversal of the jury verdict. This Court's review of decisions to admit or exclude evidence under MRE 401 and 403 is limited to whether a trial court decision was an abuse of discretion; a ruling on a close evidentiary question ordinarily cannot be an abuse of discretion. *People v Bahoda*, 448 Mich 261, 289; 531 NW2d 659 (1995). In *People v Babcock*, 469 Mich 247, 269; 666

NW2d 231 (2003), the Supreme Court redefined the abuse of discretion standard:

> [A]n abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome. When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment. An abuse of discretion occurs, however, when the trial court chooses an outcome falling outside this principled range of outcomes. [Internal citations omitted.]

The Court adopted this standard in the context of a criminal sentencing issue, but this new standard has been applied in so many contexts since it was announced[10] that we assume it applies here.

Defendants argue that the questions plaintiff asked Dykema attorney Erhardt regarding Dykema's pro bono work elicited irrelevant evidence. However, given that one of the criteria for determining reasonable attorney fees, a key issue in this case, is the reputation of the attorney or firm, this evidence could be considered marginally relevant. It was not an abuse of discretion to allow it.

Defendants also argue that the questioning of Dr. Ajluni about other lawsuits to which he was a party was irrelevant and prejudicial. Plaintiff argues that the

---

[10] See *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006) ("we prefer the articulation of the abuse of discretion standard in *Babcock* to the *Spalding* test"); *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006) (pertaining to the qualification of expert witnesses); *Herald Co, Inc v Eastern Michigan Univ Bd of Regents*, 475 Mich 463, 472; 719 NW2d 19 (2006) (pertaining to Freedom of Information Act determinations); *Radeljak v DaimlerChrysler Corp*, 475 Mich 598, 603; 719 NW2d 40 (2006) (pertaining to forum non conveniens); *People v Carnicom*, 272 Mich App 614; 727 NW2d 399 (2006) (pertaining to appointment of experts for indigent defendants).

evidence tended to establish that Dr. Ajluni was not the unsophisticated party to business dealings that he pretended to be. One might also argue that familiarity with lawsuits and therefore dealings with attorneys undercuts Dr. Ajluni's claim that he did not expect to have to pay Dykema any additional fees after the settlement agreement was reached. Given the low threshold for relevance and the high threshold for abuse of discretion, it was not error to allow this evidence.

Defendants also argue it was error to preclude Dr. Ajluni from testifying that Donald Young, the lead attorney in Ajluni's case against BCBSM, had told Ajluni he did not have to be concerned about paying attorney fees if he accepted the settlement agreement. The language of the contract speaks for itself; in the event of a non-cash resolution, the parties would agree on a fair value for legal services. Had Dr. Ajluni taken this conversation to mean Dykema had waived its rights under the contract, he should have pled waiver as an affirmative defense. He did not do so, and the trial court's decision not to admit the evidence does not rise, or sink, to a level outside the range of principled outcomes.

Finally, defendants argue that the trial court erred in ruling that defendants were precluded by estoppel from challenging the validity of the economic damages theory presented on behalf of Ajluni in the suit against BCBSM. Judicial estoppel prevents a party from taking a position in a later proceeding that is inconsistent with a position that party took successfully in a prior proceeding. *Paschke v Retool Industries*, 445 Mich 502, 509-510; 519 NW2d 441 (1994). The *Paschke* Court adopted the "prior success" rule, meaning "the mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication

that the court in the earlier proceeding accepted that party's position as true." *Id.* at 510.

In the BCBSM litigation, Ajluni's counsel presented a theory of damages and Dr. Ajluni testified to its accuracy. When the case settled, Ajluni's counsel had closed its proofs and the damage theory had at that time not been rebutted by BCBSM witnesses. Because the case was settled, the issue was not litigated to its conclusion, but that does not mean that Dr. Ajluni is free to change the position he took in that case. "The prior success rule limits the application of judicial estoppel to a situation where a party attempts to invoke the authority of a second tribunal 'to override a bargain made' with a prior tribunal." *Opland v Kiesgan*, 234 Mich App 352, 365; 594 NW2d 505 (1999) (citation omitted). Here, the settlement between BCBSM and Ajluni was a bargain made with a prior tribunal. The uncontradicted damages theory presented by Ajluni was successfully presented and could not be challenged by Ajluni in a second proceeding.

None of defendants' claims of evidentiary error are sufficient to merit a new trial.

## V. THE TRIAL JUDGE'S INAPPROPRIATE CONDUCT

Finally, defendants argue that Judge Moore's inappropriate commentary throughout the trial prejudiced their case such that reversal and a new trial are required.[11] Again, we disagree.

Defendants argue that Judge Moore talks too much, and that his comments are often inappropriate, particularly where he summarizes the testimony of a witness,

---

[11] Defendants note that this is not the first such claim of inappropriate behavior by Judge Moore. See *In re Moore*, 464 Mich 98; 626 NW2d 374 (2001).

or the evidence presented so far, or what he believes to be the case one side or the other intends to present or has presented. Judge Moore admitted during trial that he talks too much; as he said, "I've been told that for 25 years. So I don't know what I can do about that." His opening comments to the jury take up 40 pages of trial transcript, and near the end of that lengthy monologue, the judge's closing comment was "from now on you won't hear a whole lot from me except when I have to rule on a motion and tell you quitting time and let's go to work and come back or some of my famous stories to fill up the space when there's a pause, pregnant pause or I think you're ready for another jury or courtroom story."

While we agree that Judge Moore's manner of moving the trial along is sometimes inappropriate, we also find that it is not prejudicial to one side or the other. We find that in this case, where the evidence of Dr. Ajluni's misconduct was overwhelming and uncontroverted, the judge's conduct did not improperly affect the outcome:

> In determining whether remarks made by a trial judge during the course of the trial were improper and prejudicial, the context in which the remarks were made must be considered. This Court will not reverse a jury verdict on account of comments made by a judge during the course of trial where it is apparent from the record that the verdict rendered was that of the jury and not the expressed opinion of the trial judge. [*Keefer v C R Bard, Inc,* 110 Mich App 563, 577; 313 NW2d 151 (1981) (citation omitted).]

Defendants include a long list of inappropriate comments in their brief on appeal. However, the comments defendants complain of are either taken out of context or defendants have failed to include other comments made by the judge that mitigate or contradict the challenged comments. For example, defendants correctly note that the judge did say with respect to

Dykema's first witness that "what this witness says is the reason we're here today." But defendants do not add that in the next breath, the judge said of the witness's testimony: "Whether or not that's true or not, these jurors have not made a conclusion because I told them not to make any final decision about any fact until they've heard all of the evidence. And I'm sure they'll [sic] be evidence to the contrary."

Defendants object to Judge Moore's comments to or about various Dykema witnesses as unfairly bolstering their credibility with the jury, referring to one Dykema witness's testimony as "enlightening," and characterizing another Dykema witness as "[m]y kind of man." But defendants do not add that Judge Moore welcomed nearly every witness to the stand with some comment, for example, saying to Howard (Buck) O'Leary, Jr.: "You're like me. You'll be Junior all your life." Judge Moore's conversational style is rampant throughout the trial, but it does not favor or disfavor either party or any witness.

Defendants argue that Judge Moore's habit of summarizing influenced the jury; the judge does have a tendency to reflect aloud about what a witness has said or what one side or the other is arguing when an objection is raised. But Judge Moore did take steps to clarify to the jury that he was not making statements of fact or conclusions when he summarized. For example, after one such summary he stated:

> I mean that's what we've heard. Now what the jury decides—Believe me, ladies and gentlemen, I'm just repeating what I hear just like they will.
>
> But you are the fact finders. I don't know if any of that happened. But you will tell us when you deliberate what, if anything, happened.

While we would caution Judge Moore to curb his courtroom commentary, we do not find that in this case defendants were prejudiced by it. Defendants are correct that the trial judge's frequent monologues, either thinking aloud or summarizing for the jury, are improper, but their argument that this behavior demonstrated bias and prejudiced the jury is simply not supported by the record. Defendants were not denied a fair trial by Judge Moore's conduct. We note also that defense counsel failed to object at trial to the comments complained of on appeal; had they done so, they might have minimized the commentary.

### VI. DEFENDANTS' COUNTERCLAIM FOR LEGAL MALPRACTICE

Defendants claim, in essence, that plaintiff committed legal malpractice by not informing Dr. Ajluni that if he signed the settlement agreement, he would still have to pay his legal bills. Defendants suggest they would have reached a different decision as to the settlement had they known the magnitude of their legal expenses. However, it is clear that had the suit continued, Dr. Ajluni would have been recalled as a witness, at which point he would either have had to admit to fraudulent billing practices, or lie. It is unrealistic to assert that the litigation could have continued, and particularly to assert that it would have ended more successfully for Dr. Ajluni had it continued. As plaintiff correctly points out, any damages defendants suffered are speculative at best.

More to the point, "a plaintiff in a legal malpractice action must show that but for the attorney's alleged malpractice, he would have been successful in the underlying suit." *Coleman v Gurwin*, 443 Mich 59, 63; 503 NW2d 435 (1993).

> [A] plaintiff who alleges legal malpractice must prove professional negligence, i.e., that counsel failed to exercise

reasonable skill, care, discretion, and judgment in the conduct and management of the underlying case. The plaintiff also must establish that, but for the negligence, the outcome of the case would have been favorable to the plaintiff. [*Radtke v Miller, Canfield, Paddock & Stone*, 453 Mich 413, 424; 551 NW2d 698 (1996).]

The malpractice alleged is the failure to disclose that legal fees would be owed. This is immaterial to the outcome of the suit itself. The suit ended as it did because Dr. Ajluni's fraudulent billing practices became known to both sides. Defendants' claim for malpractice was not sustainable on these facts, and the trial court did not err in granting summary dismissal of that claim.

### VII. PLAINTIFF'S CROSS-APPEAL: REMITTITUR

Plaintiff's first issue on cross-appeal is the trial judge's grant of remittitur in response to defendants' motion for a new trial.

In determining whether remittitur is appropriate, a trial court must decide whether the jury award was supported by the evidence. *Diamond v Witherspoon*, 265 Mich App 673, 693; 696 NW2d 770 (2005). This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented. *Palenkas v Beaumont Hosp*, 432 Mich 527, 532; 443 NW2d 354 (1989); *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 499; 668 NW2d 402 (2003). Such criteria include whether the verdict was influenced by bias or prejudice and whether the award was comparable to awards in similar cases. *Palenkas, supra; Diamond, supra* at 694. The trial court's decision regarding remittitur is reviewed on appeal for an abuse of discretion. *Palenkas, supra* at 533; *Grace v Grace*, 253 Mich App 357, 367; 655 NW2d 595 (2002).

Defendants moved for judgment notwithstanding the verdict or for a new trial. During the hearing on defendants' motion, the trial judge said of the jury's verdict:

> I thought the verdict was a little bit excessive and was somewhat motivated by bias. I thought it was about $200,000 too much. . . .
>
>         * * *
>
> [S]ince we did it on a quantum merit [sic] and based on all the evidence that we heard I thought that based on the hours and all of that that was true. I think that the jury went beyond by giving a verdict of $700,000, in this instance, did it not based on the evidence and rather based on passion and prejudice.

Judge Moore ordered "that there be a $200,000 remittitur on that judgment . . . . Or else I will give him a new trial." He further stated, "I don't think he deserves a new trial on any other basis, other than that."

The trial judge apparently believed the jury awarded excessive damages based on bias against defendant Dr. Ajluni. The judge explained to counsel for both parties: "[T]hey didn't like Dr. Ajluni. They didn't mind you, Mr. Evans [defense counsel], but they didn't like your client. . . . And I think therefore they kind of wanted to punish him." However, the supposition that the jury found Dr. Ajluni distasteful does not equate to a finding that the verdict was not supported by the evidence.

Likewise, a verdict of $700,000 in a case where the contingent fee in the underlying action would have been, according to the evidence presented, $975,000,[12] is not soexcessive as to fall outside the range of outcomes supported by the evidence.

---

[12] Damages sought in the BCBSM litigation included $1.9 million in economic damages, and $1.9 million in non-economic damages; the 25% contingent fee would have been $975,000.

The jury considered evidence of the hourly rates of the attorneys involved and the number of hours worked, but the evidence they considered also included the fee agreement, and that fee agreement combined some hourly billing with a contingency fee arrangement, and included a provision that the parties would agree on a "fair value" in the event that the litigation led to a non-cash resolution. The jury, as the finder of fact, had discretion to consider all of the evidence and arrive at an amount that it deemed just. The jury did so. The trial judge introduced no evidence or reasoning into the record to indicate that the award was outside the range of outcomes the evidence could support; he merely stated that he felt the jury was biased.

It seems apparent that the judge altered the damages award because he would have decided differently had he been the trier of fact, not because the award was outside the range of what the evidence could support. That is not among the limited bases for remittitur, and is therefore an abuse of discretion. The order of remittitur is reversed.

### VIII. PLAINTIFF'S CROSS-APPEAL: INTEREST CALCULATION

Plaintiff next argues on cross-appeal that the trial judge erred by misapplying MCL 600.6013(8), the statute governing the calculation of interest on the judgment. We agree.

This Court reviews questions of statutory interpretation de novo; where statutory language is unambiguous, it is given its plain meaning and enforced as written. *Ayar v Foodland Distributors*, 472 Mich 713, 715-716; 698 NW2d 875 (2005). Plaintiff correctly cites MCL 600.6013(8) for the proposition that interest is calculated "from the date of filing the complaint." And *Ayar, supra* at 716-717, clarifies that this holds true for

all parts of the judgment, including attorney fees and costs ordered as mediation sanctions.

During the hearing on plaintiff's motion to add costs and interest to the judgment, plaintiff's counsel explained the statute and the caselaw to the judge, who nonetheless ruled that the interest on the attorney fees awarded as sanctions because defendants rejected the mediation settlement should be calculated only from the date of the rejection, not from the date of filing. The judge added, "If I'm compromising you, it's not serious." It appears that the trial judge was simply wrong in the application of the law. The interest calculation is accordingly reversed.

### IX. CONCLUSION

We affirm the jury verdict as to liability and damages. We reverse the trial court's reduction of the jury award by remittitur, and remand for reinstatement of the jury award of damages and for calculation of interest in accordance with the statute. We do not retain jurisdiction.

BORRELLO, P.J., concurred.

JANSEN, J. (*concurring in part and dissenting in part*). I concur in the result reached by the majority. I write separately because I would not decide this appeal on the basis of quantum meruit and because I dissent insofar as the majority announces a new rule of law.

The trial court properly determined that defendants breached the parties' express contract. I would affirm the finding of liability on this ground. Accordingly, I would not reach the issue whether recovery was alternatively justified under the equitable doctrine of quantum meruit. Such a discussion of quantum meruit is

irrelevant and merely cumulative in light of the court's proper finding of a breach of contract.

I also note that the express language of the contract itself explicitly contemplated quantum-meruit-like recovery. In other words, the contract was not a traditional contingent-fee contract. It provided that "[i]f there is a resolution of the litigation which involves something other than a cash payment, fair value will be given for the benefit based on an agreement to be reached between you and the Dykema firm." This clause, rather than providing for a traditional contingent fee, essentially provided for quantum-meruit-like contract damages in the event that the litigation was resolved through a noncash settlement.

This is precisely the manner in which the litigation betweens defendants and BCBSM was resolved here—not by way of a cash payment, but by way of a confidential settlement agreement and a voluntary dismissal of the claims and counterclaims. Therefore, pursuant to the parties' express agreement, quantum-meruit-like recovery was the appropriate measure of contract damages at law, irrespective of the applicability of the equitable remedy of quasi-contract or quantum meruit in this matter.

Inasmuch as the majority announces a new rule of law regarding the applicability of quantum meruit in the context of legal-fee recovery, I respectfully dissent. I would not announce any new rule of law in this regard.

I would not decide this appeal on the basis of the equitable doctrine of quantum meruit. Nor would I announce a new rule of law concerning the applicability of quantum meruit in the context of legal-fee recovery. Otherwise, I concur in the result reached by the majority.