The **BOARD OF TRUSTEES OF THE CITY OF BIRMINGHAM EMPLOYEES' RETIREMENT SYSTEM, et al.,** Plaintiffs,

v.

**COMERICA BANK, Defendant.**

**Case Nos. 09–cv–13201, 10–cv–10206.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 15, 2011.

Christopher D. Kaye, E. Powell Miller, Miller Law Firm, Rochester, MI, Sharon

S. Almonrode, Sullivan, Ward, Southfield, MI, for Plaintiffs.

Robert G. Brower, Thomas P. Bruetsch, Bodman, Detroit, MI, for Defendant.

## *OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (docket no. 51)*

STEPHEN J. MURPHY, III, District Judge.

In this proposed class action, nine pension plans, through their boards of trustees ("Plaintiffs"), contend that Defendant Comerica Bank ("Comerica") violated various state and federal statutes in the course of managing the plans' assets. Plaintiffs assert claims for declaratory judgment (count I), breach of fiduciary duty under the common law (count II), ERISA violations (counts III and IV), violations of Michigan law (count V), breach of contract (count VI), and breach of the implied covenant of good faith and fair dealing (count VII). The nub of Plaintiffs' claims is that Comerica invested some of Plaintiffs' assets in a security that Comerica knew or should have known was not a prudent investment, and, when it became clear the security would fail, refused to sell it, resulting in a loss for which Plaintiffs were not later indemnified.

Comerica moves to dismiss the complaint for failure to state a claim. The Court conducted a hearing on the motion and took the matter under advisement. For the reasons stated below, the Court will grant Comerica's motion in part and deny it in part. All ERISA claims asserted here by governmental pension plans will be dismissed with prejudice.

## BACKGROUND FACTS

The following facts are alleged in the amended complaint or contained in documents attached to it, and adopted by reference by the Court for purposes of resolving this motion. *See Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.,* 508 F.3d 327, 335 (6th Cir.2007) (citing Fed. R.Civ.P. 10(c)).

Plaintiffs are nine boards of trustees of various pension and retirement plans in Michigan.[1] Four of the boards govern governmental plans and the five others govern private plans. Amend. Compl. ¶¶ 9–17. Plaintiffs participated in Comerica's Securities Lending Program ("Program") and each entered into substantially similar Security Lending Agreements ("Agreements") with Comerica. Under the Agreements, Comerica would loan Plaintiffs' securities (held in accounts with Comerica) to third-parties in exchange for collateral worth slightly more than the securities' market value. *Id.* ¶ 7. Comerica would pool the collateral given for each participant's securities into a "collateral investment pool" and invest the pool conservatively. *Id.* ¶ 24. When the loans became due, Comerica would return the collateral and Plaintiffs would retake the securities and keep the investment income. *Id.* ¶ 29. For its services, Comerica charged Plaintiffs a percentage of the investment income. *Id.*

Each Agreement contained investment guidelines listing the specific types of investments in which Comerica was permitted to invest, as well as more general limitations on investments that Comerica was permitted to pursue. Amend. Compl. Exs. A–I. The guidelines permit a wide variety of investments, including "[c]orpo-

---

**1.** The Court consolidated this action with *Board of Trustees of the Iron Workers' Local No. 25 Pension Fund, et al. v. Comerica Bank,* Case no. 10–cv–10206 (E.D.Mich.) upon the joint request of the parties and upon a finding that the cases involved common issues of law and fact.

rate medium term notes and corporate floating rate instruments with a minimum long-term investment grade rating." Amend. Compl. Ex. A–I (guidelines, at I(B)).[2] The guidelines also establish "[a] per issuer limit of 5% of the cash collateral pool [for] the purchase of . . . corporate or medium term notes." *Id.* at II(D). Precisely because the collateral had to be returned at the end of the loan period, safeguarding principal was the primary objective of the Program. *Id.* ¶¶ 7, 49. Other goals included maintaining a diversified portfolio of investments and adequate liquidity, and optimizing the spread between collateral earnings and the rebate paid to the borrowers of the securities. *Id.* ¶ 52. Comerica expressly disclaimed any duty to indemnify Plaintiffs in the event of a loss. *Id.* Exs. A–I.

In the summer of 2007, Comerica invested an unidentified percentage of the collateral investment pool in medium-term notes issued by Sigma Finance, Inc.[3] *Id.* ¶ 59. Sigma Finance, Inc. is a Delaware corporation organized for the purpose of issuing debt securities for its offshore parent company, Sigma Finance Corporation ("Sigma"). *Id.* Sigma is a structured investment vehicle that is now in receivership.[4]

Specifically at issue here is Comerica's investment in Sigma corporate medium-term notes with a maturity date of May 18, 2009 ("Sigma notes"). *Id.* ¶ 164. At the time of purchase, the Sigma notes were rated AAA by Standard & Poor's and Aaa by Moody's Investors Service, the highest ratings available for investment-grade securities. *Id.* ¶ 138. Nevertheless, Plaintiffs contend that the investment was too risky from the outset because Sigma was a stand-alone entity with $52 billion in debt as of July 2007, and had no investment or commercial bank behind it. *Id.* ¶¶ 63, 65, 104. For support, Plaintiffs include in their amended complaint various quotations from and paraphrasing of articles in news sources beginning in August 2007. The articles discuss both structured investment vehicles generally and Sigma specifically. *Id.* ¶¶ 68–158. The articles also document the steady decline of Sigma from the summer of 2007 until October 1, 2008, when Sigma was placed in receivership, and the Sigma notes lost considerable value. Sigma's creditors declared Sigma in default and seized its assets, ultimately sending the company into receivership. *Id.* ¶ 157–163.

Plaintiffs assert seven counts against Comerica, claiming that Comerica should never have invested in the Sigma notes, failed to properly monitor the investment, and failed to sell the notes before they lost considerable value. Plaintiffs contrast Comerica's allegedly imprudent conduct with that of the Orange County California Treasurer's Office, which, on September

**2.** Although some of the Agreements attached to the amended complaint do not include investment guidelines, Plaintiffs allege that each Agreement was subject to substantially similar guidelines. *See* Amend. Compl. ¶ 183 (alleging as common question of fact whether Comerica violated obligations set forth in investment guidelines applicable to Plaintiffs and proposed class members).

**3.** Plaintiffs do not identify how much Comerica invested in Sigma. But it seems fairly certain the investment did not exceed 5% of the collateral investment pool, given, among other things, that Plaintiffs do not allege that

Comerica violated the provisions in the guidelines limiting investments in corporate medium term notes to 5% per issuer. *See* Amend. Comp. ¶ 253.

**4.** A structured investment vehicle issues short-term, low-yielding debt, typically in the form of medium-term notes and commercial paper, and uses the proceeds from the issuance to buy long-term, high-yielding assets. It earns revenue because the long-term assets yield higher returns than is required to pay on the short-term debt. Amend. Compl. ¶¶ 61–62; *see also Patten v. Northern Trust Co.*, 703 F.Supp.2d 799, 806 n. 7 (N.D.Ill.2010).

12, 2008, sold Orange County's investments in Sigma notes for 91.5 cents on the dollar, thereby avoiding a $50 million loss. *Id.* ¶ 153. Plaintiffs contend that despite the red flags raised by numerous financial experts and market reports, Comerica failed to take similar action to protect Plaintiffs' assets. *Id.* ¶ 154.

## DISCUSSION

### I. *Legal Standard–Rule 12(b)(6)*

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, pp. 233–34 (3d ed.2004)). Accordingly, Federal Rule of Civil Procedure 12(b)(6) allows a defendant to test whether, "as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *See Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). "To survive a motion to dismiss under Rule 12(b)(6) motion, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Hunter v. Sec'y of the U.S. Army,* 565 F.3d 986, 992 (6th Cir.2009) (citation omitted).

In assessing a motion brought pursuant to Rule 12(b)(6), a court must presume as true all well-pleaded factual allegations and draw all reasonable inferences from those allegations in favor of the non-moving party. *Bishop v. Lucent Techs., Inc.,* 520 F.3d 516, 519 (6th Cir.2008). Although the pleading standard is liberal, and a court must accept as true all *factual* allegations in the complaint, it need not accept as true any legal conclusion alleged there-

in, even if couched as a factual allegation. *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1945, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts upon which he bases his claim. They require only "a short and plain statement of the claim" that gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Fed.R.Civ.P. 8(a). This requires a plaintiff to put forth "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the requisite elements of the claim]." *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. Thus, although "a complaint need not contain 'detailed' factual allegations, its '[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir.2007) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Therefore, the Court will grant a Rule 12(b)(6) motion only in cases where there are simply not "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal,* 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

### II. *Analysis*

Comerica makes four arguments in its motion: A) the governmental plans cannot assert claims under ERISA; B) Plaintiffs improperly view the Sigma investment in isolation rather than as part of a broader investment portfolio; C) the allegations fail to give rise to plausible claims because

they rely on hindsight and speculation and because there are obvious alternative explanations for the harm caused to Plaintiffs; and D) Michigan does not recognize a cause of action for breach of the covenant of good faith and fair dealing. The Court addresses each below.

### A. Trustees of Governmental Plans Cannot Assert Claims Under ERISA

■ Four of the named plaintiffs govern pension plans for employees of governmental entities.[5] Amend. Compl. ¶¶ 9, 10, 14, 15. ERISA expressly exempts from coverage "any employee benefit plan if ... such plan is a governmental plan." 29 U.S.C. § 1003(b)(1). "Governmental plan" is defined to include "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." Id. § 1002(32).

The parties do not dispute that four of the named plaintiffs meet this definition and are therefore not otherwise covered by ERISA.[6] Plaintiffs assert instead that the duties imposed on Comerica by Michigan's Public Employee Retirement System Investment Act ("PERSIA"), Mich. Comp. Laws § 38.1132 et. seq.—which governs the four governmental plans here—are

analogous to the duties ERISA imposes on fiduciaries. But even if this is true, to say that ERISA is *persuasive* in applying PERSIA is not the same as saying that ERISA itself *applies* to plans Congress expressly exempted from ERISA's coverage. And while, as a practical matter, Michigan courts might look to ERISA and interpretive case law as persuasive authority in applying PERSIA, this fact cannot abrogate the statutory exception Congress created for governmental plans.

Plaintiffs also contend that because the investment pool contained collateral of both ERISA and non-ERISA plans alike, Comerica owed identical fiduciary duties with respect to each plan with assets in the pool. And since some of the collateral belonged to plans to whom Comerica owed ERISA duties, Comerica owed those same ERISA duties to the other plans, regardless of whether ERISA otherwise would apply to them. While it may be a practical reality that Comerica exercised the same care with respect to all plans with assets in the pool, this does not permit application of ERISA to plans expressly exempted from coverage.

The Court finds that the named plaintiffs representing governmental plans cannot maintain claims under ERISA, and to the extent the complaint asserts such claims, the claims must be dismissed with prejudice.[7]

---

5. Specifically, these include the Trustees of the City of Birmingham Employees' Retirement System, Trustees of the Road Commission for Oakland County Retirement System, Trustees for the City of Monroe Employees' Retirement System, and Trustees of the Waterford Township General Employees' Retirement System.

6. The amended complaint defines "Plaintiffs" as the boards of trustees for all nine plans. See Amend Compl. Introduction. All seven counts are asserted by "Plaintiffs." Therefore, the Court reads the complaint as assert-

ing all seven counts on behalf of all nine boards.

7. Comerica has not raised the issue, but the converse would also seem to be true. That is, the trustees of the private plans cannot assert claims under PERSIA for two apparent reasons. First, PERSIA itself applies only to public plans. See Mich. Comp. Laws § 38.1132e(5). Second, ERISA has preemptive effect on state law claims that can be brought under ERISA. See Aetna Health Inc. v. Davila, 542 U.S. 200, 209, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) ("[A]ny state-law

### B. Plaintiffs Need Not Allege Mismanagement of the Entire Investment Portfolio

■ Comerica next contends that Plaintiffs are improperly viewing the Sigma notes in isolation, rather than as part of a broader and more diversified portfolio. Plaintiffs do indeed focus exclusively on Comerica's investment in the Sigma notes and do not allege imprudence in managing Comerica's other investments on behalf of Plaintiffs. But for the reasons that follow, Plaintiffs need not allege widespread mismanagement to survive the motions filed at the pleading stage.

ERISA requires fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries," and with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man ... would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Michigan law imposes analogous duties on investment fiduciaries of governmental plans. *See* Mich. Comp. Laws § 38.1133(3).

In addition to setting general standards, ERISA permits the Secretary of Labor to prescribe regulations she may find necessary to carry out the statute. 29 U.S.C. § 1135. One set of regulations, published at 29 C.F.R. § 2550.404a–1, is intended to clarify the investment duties of fiduciaries with respect to prudence, and to provide safe harbor to those who comply with them. As characterized by the Fifth Circuit, the regulations essentially "provide that the fiduciary shall be required to act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard which examined each investment with an eye toward its individual riskiness." *Laborers Nat. Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir.1999). Specifically, a fiduciary discharges his duty to be prudent if he:

[H]as given appropriate consideration to those facts and circumstances that ... [he] knows or should know are relevant to the particular investment ... involved, including the role the investment ... plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; [and has acted accordingly].

29 C.F.R. § 2550.404a–1(b)(1)(i)–(ii). "Appropriate consideration" includes determining that the particular investment "is reasonably designed, as part of the portfolio ... to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain ... associated with the investment," and giving consideration to the following factors: "(A) The composition of the portfolio with regard to diversification; (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (C) The projected return of the portfolio relative to the funding objectives of the plan." *Id.* § 2550.404a–1(b)(2)(i)–(ii).

Standing alone, however, the modern portfolio theory cannot provide a complete defense to breach of fiduciary duty claims

cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."). This effect reaches claims brought by the private plans under both PERSIA and the common law. *See Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir.1999) ("Common law breach of fiduciary duty claims are clearly preempted by ERISA."). So, to the extent the complaint can be read to assert claims under PERSIA and Michigan's common law on behalf of the private plans, these claims likely should be dismissed as well. But Comerica has not moved to dismiss the claims on preemption grounds, and the Court will therefore not address them.

at the pleadings stage. As the Secretary commented when promulgating the regulations:

The regulation ... *is not intended to suggest* either that any relevant or material attributes of a contemplated investment *may properly be ignored or disregarded,* or that a particular plan investment should be deemed to be prudent *solely by reason of the propriety of the aggregate risk/return characteristics of the plan's portfolio.* Rather, it is the Department's view that an investment reasonably designed—as a part of the portfolio—to further the purposes of the plan, and that is made upon appropriate consideration of the surrounding facts and circumstances, should not be deemed to be imprudent merely because the investment, standing alone, would have, for example, a relatively high degree of risk. The Department also believes that appropriate consideration of an investment to further the purposes of the plan must include *consideration of the characteristics of the investment itself.*

Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets under the "Prudence" Rule, 44 Fed.Reg. 37221, 37224 (June 26,1979) (emphasis added); *see also Langbecker v. Elec. Data Sys. Corp.,* 476 F.3d 299, 308 n. 18 (5th Cir.2007) ("Under ERISA, the prudence of investments or classes of investments offered by a plan must be judged individually"); *Fink v. Nat'l Sav. & Trust Co.,* 772 F.2d 951, 957 (D.C.Cir.1985) ("A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard." (citing *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983))); *Chao v. Trust Fund Advisors,* No. 02–559, 2004 WL 444029, *4 (D.D.C. Jan. 20, 2004) ("[W]hile a fiduciary may consider the prudence of an individual investment in the context of the 'whole portfolio,' such consideration does not immunize or permit any individual investment to be less than prudent.").

Therefore, while it is inappropriate to measure the ultimate prudence of a fiduciary's investment decisions by considering one individual investment in isolation, the modern portfolio theory does not permit a fiduciary to defeat liability simply by pointing out—at the initial pleadings stage of a lawsuit—that despite any decline in value of the individual investment, there was no net loss to the value of the entire portfolio as a whole. The determination of prudence requires a more refined approach than simply looking at a portfolio's net return. Indeed, the regulations provide that "appropriate consideration" includes determining whether the *"particular* investment" is reasonably designed, as part of the overall portfolio, to further the purposes of the plan. 29 C.F.R. § 2550.404a–1(b)(2) (emphasis added); *see also* 44 Fed. Reg. at 37224 ("The Department also believes that appropriate consideration of an investment to further the purposes of the plan must include consideration of the characteristics *of the investment itself."* (emphasis added)).

Should this case progress to trial, Plaintiffs will have the burden of demonstrating the imprudence of Comerica's investment in, and retention of, the Sigma notes. At that time, Comerica may seek safe harbor in the regulations by arguing that it gave "appropriate consideration" to the relevant facts and circumstances, including the role that the Sigma notes played in the entire investment portfolio. The fact-finder will have to determine whether, in the context of the entire investment pool, and after considering a developed factual record, Comerica's investment in the Sigma notes was prudent.

But for now, Plaintiffs have met their burden. Plaintiffs allege that Comerica's primary duty was to safeguard principal

and that the Sigma notes were an "inherently risky" investment for a number of reasons. Amend. Compl. ¶¶ 49, 187. First, Sigma was a structured investment vehicle that, Plaintiffs' allege, is an inherently unstable entity, making investment in them overly risky. *Id.* ¶¶ 61–62. Also, Comerica's parent company stated publicly that SIVs were "high risk, sophisticated financing vehicles" and refused to create SIVs for itself. *Id.* ¶ 64. Plaintiffs further allege that Sigma was riskier than other SIVs because it lacked a commercial bank to back it. *Id.* ¶ 65. In the event of Sigma's failure, the interests of the holders of the Sigma notes would be subordinated to those with more senior liens. *Id.* ¶¶ 60, 105.

Given the alleged riskiness of Sigma, when the "overarching goal" of Comerica's lending program was to preserve principal and maintain adequate liquidity, "a reasonably prudent investor would not have invested [Plaintiffs'] Collateral in 'high risk, sophisticated financing vehicles.'" *Id.* ¶ 66. In the face of the warnings detailed in the complaint and given the ability of other investors to recognize the risk and sell the notes before they decreased in value, Comerica still allegedly refused to sell them. *Id.* ¶¶ 89, 126, 153–54. While the prudence of the Comerica's investment in Sigma notes will ultimately be judged only after considering the role the notes played in the entire portfolio, Plaintiffs allege enough to permit the Court to infer "more than the mere possibility of misconduct" on the part of Comerica. *Iqbal*, 129 S.Ct. at 1950; *see also In re Regions Morgan Keegan ERISA Litig.*, 692 F.Supp.2d 944, 962 & n. 14 (W.D.Tenn.2010) (denying defendants' motion to dismiss ERISA prudence claim after rejecting argument that plaintiffs improperly focused on one investment vehicle in isolation).

Comerica cites two cases from the Fourth and Fifth Circuits in support of its arguments. *See* Def.'s Reply Br. 1–2 (citing *DeFelice v. U.S. Airways, Inc.*, 497 F.3d 410 (4th Cir.2007)); Def.'s Br. 8 (citing *Laborers Nat'l Pension Fund v. N. Quantitative Advisors, Inc.*, 173 F.3d 313 (5th Cir.1999)). Both cases applied the modern portfolio theory, but did so in the context of a bench trial rather than at the pleadings stage of the suit, a distinction that at least one court has found important. *See In re Regions Morgan Keegan ERISA Litig.*, 692 F.Supp.2d at 962 & n. 14 (distinguishing *DeFelice* and *Laborers*, relied upon by defendants in arguing that plaintiffs improperly viewed challenged investment in isolation, finding both cases applied theory at the merits stage, not the pleadings stage). The Court agrees with Plaintiffs that the application of the modern portfolio theory at this stage of the case is improper. While the theory certainly applies to ERISA prudence claims, it is more properly analyzed at the merits stage of this case.[8]

---

**8.** The Court's discussion of the modern portfolio theory has thus far been focused only on the ERISA claims. Comerica contends that the theory applies with equal force to PERSIA claims as well, and cites a provision of Michigan's Estates and Protected Individuals Code, called the "Prudent Investor Rule," for support. The Rule provides:

A fiduciary's investment and management decisions with respect to individual assets shall be evaluated not in isolation, but rather in the context of the fiduciary estate portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the fiduciary estate.

Mich. Comp. Laws § 700.1503(1). PERSIA does not cross-reference or otherwise adopt the foregoing standard expressly, and Comerica has cited no authority for the proposition that the Rule applies to claims under PERSIA. Conversely, the Plaintiffs object to Comerica's reliance on the Prudent Investor Rule in the PERSIA context. Pls.' Resp. Br. 16 n. 16.

Assuming Michigan's Prudent Investor Rule is consistent with the Secretary's regulations

### C. Plaintiffs Assert Otherwise Plausible Claims

■ Comerica contends next that Plaintiffs have not alleged any other plausible claims because 1) the claims are supported by nothing more than hindsight and speculative news accounts; and 2) obvious alternative explanations exist for the harm caused to Plaintiffs from the investment. Both arguments lack merit.

### 1. Plaintiffs Assert More Than Hindsight and Speculation

Comerica argues that Plaintiffs fail to allege sufficient factual detail permitting the Court to draw the reasonable inference that Comerica knew or should have known that Sigma would fail before it invested in Sigma and later failed to sell the investment.

■ The ultimate outcome of an investment is not proof of imprudence. The fiduciary duty of care " 'requires prudence, not prescience.' " *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir.1990) (quoting lower court opinion, 720 F.Supp. 1342, 1349 (N.D.Ill.1989)). Accordingly, it is inappropriate to consider the prudence of an investment decision solely from the perspective of hindsight. *See Chao v. Merino*, 452 F.3d 174, 182 (2d Cir.2006); *Donovan*, 716 F.2d at 1467 ("The test of prudence ... is one of conduct, and not a test of the result of performance of the investment. The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed." (quotation marks and citation omitted)); *accord In re Messer Trust*, 457 Mich. 371, 382–83, 579 N.W.2d 73 (1998) (citing with approval *In re Janes Estate*, 90 N.Y.2d 41, 50, 659 N.Y.S.2d 165, 681 N.E.2d 332 (1997)).

Comerica contends that Plaintiffs' claims are supported by nothing more than hindsight. Comerica relies heavily on the Southern District of New York's unpublished decision in *Board of Trustees of the S. Cal. IBEW–NECA Defined Contribution Plan v. The Bank of New York Mellon Corp.*, No. 09 Civ. 6273, 2010 WL 1558587 (S.D.N.Y. Apr. 14, 2010), in which a federal district court dismissed the plaintiffs' complaint after finding that the complaint did not assert plausible claims. The plaintiff retirement plan participated in Bank of New York Mellon Corp.'s securities lending program, similar to the one at issue here. The lawsuit concerned Mellon's investment of the plaintiff's collateral in a floating-rate note issued by Lehman Brothers. *Id.* at *3. When the investment failed due to Lehman's bankruptcy in September 2008 (one year after Mellon invested a small portion of the cash collateral in the Lehman notes), plaintiffs sued Mellon for breach of ERISA's fiduciary duties. Central to the complaint was the allegation that "[i]t was widely known or should have been known among sophisticated investment managers like Defendant[s] that Lehman was heavily invested in asset-backed securities, and that these types of investments were inherently risky." *Id.* The complaint included excerpts from various news articles published just before the bank invested in the notes and the months before Lehman filed for bankruptcy, warning about the "risks associated with asset-backed securities," securities which Lehman was holding in massive amounts. *Id.*

Mellon moved to dismiss the claims on the ground that the plaintiff failed to adequately allege that Mellon knew or should have known about Lehman's ultimate collapse before it happened. The district

and that PERSIA adopts the Rule—issues the Court need not and will not decide now—the Court's analysis with respect to the ERISA claims would apply with equal force to the PERSIA claims in this case as well.

court granted the motion, agreeing that the allegations failed to support a reasonable inference that Mellon had prior knowledge of the impending collapse. *Id.* at *4. The plaintiff had alleged only that—due to Lehman's "overall exposure" to asset-backed securities, which market reports warned were "risky"—any investment in Lehman was imprudent because of "what was known or should have been known to a sophisticated investor acting in a fiduciary capacity ... to preserve principal," i.e., that Lehman allegedly "was following the same path as Bear Stearns" and would collapse. *Id.* at *5. The district court found the allegations conclusory and lacking in support for the claim that Mellon "actually or constructively knew about Lehman's imminent collapse." *Id.* at *6. While the factual allegations perhaps suggested it was "theoretically conceivable" that Mellon knew or should have known about Lehman's financial condition, "the *Twombly* decision argue[d] against crediting this type of speculation." *Id.*[9]

Comerica's attempt to demonstrate substantial similarity between the complaint in *Mellon* and the complaint here simply because both rely on market reports is not persuasive. The complaint in *Mellon* contained conclusory allegations supported by a few news articles addressed not specifically to Lehman or its notes, but rather to the "risky asset-backed securities" to which Lehman was exposed. *Id.* at *5. It did not contain any factual enhancement demonstrating that it was plausible that Mellon knew or should have known that

the Lehman notes were too risky to be a prudent investment. Plaintiffs' present complaint, by contrast, contains substantial factual support for the claim that Comerica knew or should have known that Sigma was a poor investment. The numerous articles cited in the complaint specifically address Sigma and the notes at issue here, and not simply SIVs and floating-lien medium-term notes generally.[10] *See* Amend. Compl. ¶¶ 132–154.

The Court finds the allegations in the complaint are not based on hindsight and sufficiently state plausible claims. *See also Rushing v. Wells Fargo Bank, N.A.,* 752 F.Supp.2d 1254, 1264–65, 2010 WL 4639308, *9 (M.D.Fla.2010) (declining to follow *Mellon,* finding plaintiff stated claim for breach of fiduciary duty arising out of bank's investment of cash collateral in Lehman notes when plaintiff claimed that "based on media reports and the downgrading in Lehman's rating," Wachovia knew Lehman's financial situation was deteriorating, making any investment in Lehman notes imprudent).

2. *There Exist No Obvious Alternative Explanations for the Harm to Plaintiffs*

Comerica also contends in a separate, but related, argument that Plaintiffs' claims are implausible because there exist alternative explanations for the harm that befell Plaintiffs. In *Twombly,* the Court held that where exists an "obvious alternative explanation" for the harm caused to

---

9. The district court later vacated its judgment and permitted the plaintiff to file an amended complaint since the plaintiff submitted new evidence allegedly showing the bank's actual knowledge of Lehman's precarious financial condition. *Board of Trustees of Southern California IBEW–NECA Defined Contribution Plan v. Bank of New York Mellon Corp.,* 2010 WL 3958790 (Sept. 07, 2010). Since the *vacatur* was based on matters outside of the merits of the bank's motion to dismiss, it does not di-

minish any persuasive value the case might otherwise have.

10. Comerica submitted a copy of the complaint considered in *Mellon.* The Court has reviewed it and agrees that it is conclusory. It stands in start contrast to Plaintiffs' complaint here, which contains numerous articles specific to Sigma and the Sigma notes at issue in this case.

the plaintiff, alleged wrongdoing must be the more plausible conclusion for the claim to survive a motion to dismiss. *Twombly*, 550 U.S. at 567–68, 127 S.Ct. 1955. In *Iqbal*, for example, the Court found that it was more likely that the arrest and detention of Arab Muslim men after 9/11 was undertaken because of their suspected link to the 9/11 attacks, than that the arrests were undertaken simply for the sake of subjecting the men to purposeful and invidious discrimination. 129 S.Ct. at 1951–52. As between these alternative explanations, "discrimination [was] not a plausible conclusion" and the Court dismissed the complaint. *Id.*

Relying on the "alternative explanation" language, Comerica contends that Plaintiffs' conclusion of wrongdoing here is as likely as the conclusion that the Sigma notes were part of an unprecedented and unforeseeable market crisis that Comerica could not have predicted. Comerica also contends that it is just as likely (in fact *more* likely) that Comerica made a reasoned judgment that the risk of loss from holding the Sigma notes was less than the risk of selling them in a distressed market. Given these as-likely alternative explanations, Comerica concludes, wrongdoing is not a plausible conclusion.

The Court disagrees with the argument, and finds that the allegations in the complaint permit the Court to infer more than the mere possibility of misconduct. *Iqbal*, 129 S.Ct. at 1950. As discussed above, the news articles cited in the complaint are specific to Sigma and the Sigma notes. At least with respect to the claim that Comerica failed to heed the market's warnings regarding Sigma—the only claim challenged by this argument—the Court can infer from the allegations that Comerica was aware of the significant problems with Sigma but failed to act to protect Plain-

tiffs' assets, and not on the basis of any reasoned judgment. The fact that Standard & Poor and Moody's Investors Service gave the Sigma notes a high rating when Comerica bought them might not help Plaintiffs's cause, but that fact is not strong enough to defeat the claims at this early stage, given both that the agencies later lowered their ratings of Sigma and other market reports warned of Sigma's significant financial difficulties.[11]

Comerica also relies heavily on Plaintiffs' allegation that Orange County sold its investment in Sigma notes for 91.5 cents on the dollar, to demonstrate that the market still valued the notes as late as three weeks before Sigma's collapse. It is possible to infer from this transaction that many market actors continued to value Sigma and believed it would survive. It is also possible to infer, however, that despite the fact that the market valued the notes as highly as it did, actors such as Orange County were able to recognize that the notes were a poor investment and to sell them before they devalued any further. Given the numerous market reports warning of the risk of investing in Sigma, the latter inference is more plausible. Thus, there exists no "*obvious* alternative explanation" for the harm that befell Plaintiffs as a result of Comerica's alleged breach of fiduciary duty. *Twombly*, 550 U.S. at 567, 127 S.Ct. 1955 (emphasis added). Plaintiffs state plausible claims.

### D. *Plaintiffs Assert a Valid Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing*

Comerica contends that Plaintiffs cannot maintain a cognizable claim of breach of the implied covenant of good faith and fair dealing because Michigan does not recog-

---

11. Moreover, some reports harshly criticized the rating agencies for failing to lower their ratings of Sigma sooner. *See, e.g.,* Amend. Compl. ¶¶ 134, 135.

nize such a cause of action. The Court disagrees.

 While Michigan courts have indeed stated that Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing, *see, e.g., Dykema Gossett, PLLC v. Ajluni,* 273 Mich.App. 1, 13, 730 N.W.2d 29 (2006), *vacated in part on other grounds,* 480 Mich. 913, 739 N.W.2d 629 (2007); *Fodale v. Waste Mgmt. of Mich., Inc.,* 271 Mich. App. 11, 35, 718 N.W.2d 827 (2006); *Belle Isle Grill Corp. v. Detroit,* 256 Mich.App. 463, 476, 666 N.W.2d 271 (2003),[12] a more precise and accurate statement of the law is that Michigan does not recognize an *independent tort action* for breach of a contract's implied covenant of good faith and fair dealing. *See, e.g., Kewin v. Mass. Mut. Life Ins. Co.,* 409 Mich. 401, 422–423, 295 N.W.2d 50 (1980); *Ulrich v. Fed. Land Bank of St. Paul,* 192 Mich.App. 194, 197, 480 N.W.2d 910 (1991) (per curiam); *see also Gen. Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 334 n. 23 (3d Cir.2001) (noting overly broad statements made by Michigan courts regarding the cause of action). Michigan recognizes that an enforceable implied covenant of good faith and fair dealing arises when one party to a contract makes its performance a matter of its own discretion. *Stephenson v. Allstate Ins. Co.,* 328 F.3d 822, 826 (6th Cir.2003) (applying Michigan law); *Burkhardt v. City Nat'l Bank of Detroit,* 57 Mich.App. 649, 652, 226 N.W.2d 678 (1975). A breach of the duty is a breach of the contract, not a tort. The duty arises to protect the parties' reasonable expectations. *Stephenson,* 328 F.3d at 826. A covenant does not arise when the parties have "unmistakably expressed their respective rights," and the duty cannot override express contract terms. *Id.*

Plaintiffs allege that the securities lending agreements reserved to Comerica discretionary authority and control with respect to the management and investment of Plaintiffs' collateral. Amend. Compl. ¶¶ 4, 5, 53, 57, 196, 231. Accordingly, Comerica assumed a duty to exercise this discretion in good faith and with fair dealing. *Id.* ¶ 259. Plaintiffs further allege that Comerica breached this duty (and thereby the contract) "by engaging in imprudent and disloyal investment activities." *Id.* ¶ 260. Contrary to Comerica's statements otherwise, Plaintiffs do not assert an independent tort action in count VII. Asserting the claim in a separate count does not render it an independent tort action. Plaintiffs adequately allege that Comerica breached its implied covenant of good faith and fair dealing.

### ORDER

**WHEREFORE,** it is hereby **ORDERED** that Defendant's motion to dismiss is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED THAT** claims asserted by the Trustees of the City of Birmingham Employees' Retirement System, Trustees of the Road Commission for Oakland County Retirement System, Trustees for the City of Monroe Employees' Retirement System, and Trustees of the Waterford Township General Employees' Retirement System for violations of ERISA § 404 (count III), violations of ERISA § 406 (count IV) are **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

---

**12.** Comerica relies on *Dykema Gossett,* which cites both *Fodale* and *Belle Isle. See* Def.'s Br.

15.